**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, Michael Belleau, depose and state as follows:

**AGENT BACKGROUND**

1.        I am a State Trooper with the New Hampshire State Police and have been so employed by the New Hampshire Department of Safety since December of 2012. Prior to my present employment, I was employed by the City of Somersworth as a full-time Police Officer from September 2007 to December 2012. I received my Bachelor's degree in Criminal Justice Studies from St Anselm College in May of 2005. I have been certified as a full-time police officer after receiving my certification in January 2008, as a member of the 145th Police Academy class from the Police Standards and Training Council in Concord, NH. I have since attended the New Hampshire State Police Basic Drug Investigation Course, the United States Drug Enforcement Administration Basic Drug Identification Course, Traps and Hides School by the Drug Enforcement Administration, and the Federal Bureau of Investigation's Regional Undercover School among other drug related trainings. I was assigned to the New Hampshire State Police Narcotic Investigations Unit as a Detective from 2016 until February of 2022, before being assigned as a task force officer ("TFO") to the Federal Bureau of Investigation ("FBI") Major Offender Task Force ("MOTF"), where I am currently assigned. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1) & 846. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

2.    During my time as a detective, I have investigated a number of cases involving the distribution of narcotic drugs by mid to high level drug trafficking organizations ("DTO"). During those investigations, I have participated in surveillance, the execution of search warrants, controlled buys, wire taps, and the interviewing of witnesses, suspects and informants.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

4.    I submit this affidavit in support of an application for a search warrant for both historical and prospective information associated with a certain cellular telephone assigned call number 401-391-3004 ("**Target Phone**"), IMSI: 310280128704279, operated by AT&T, subscribed to Grisselle Medrano Gonzalez, 673 East Ave., Warwick, Rhode Island, believed to be used by Rafael PIMENTEL ("PIMENTEL"), for a period of 30 days, historically and prospectively. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41.

5.    The information sought is in the custody or control of AT&T, a wireless telephone service provider that accepts service of process at 1025 Lenox Park Blvd., Atlanta, Georgia 30319. As a provider of wireless communication service, AT&T is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

6.    The **Target Phone** is described herein in Attachment A, and the information to be seized is described herein and in Attachment B. The warrant would require AT&T to disclose to the government copies of the information further described in Attachment B.

2

7.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

8.      The court has jurisdiction to issue the proposed ping warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the charged offenses, see 18 U.S.C. § 271 1(3)(A)(i).

9.      Based on the information contained herein, there is probable cause to believe that PIMENTEL has violated 21 U.S.C. §§ 841(a)(1), 846, Conspiracy to Distribute Controlled Substances. On August 12, 2025, Judge Andrea K. Johnstone, United States Magistrate Judge for the District of New Hampshire issued a criminal complaint and arrest warrant for PIMENTEL for conspiracy to distribute controlled substances. 25-mj-138-AJ. On September 17, 2025, PIMENTAL was indicted for conspiracy to distribute and possess with intent to distribute controlled substances. 25-CR-78-JL. There is also probable cause to believe that the information described in Attachment B will assist law enforcement in arresting PIMENTEL, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

## **PROBABLE CAUSE**

10.      As previously stated, on August 12, 2025, Magistrate Judge Johnstone issued a criminal complaint and arrest warrant for PIMENTEL for distribution of controlled substances. The complaint, affidavit, motion to seal, and arrest warrant are attached hereto as Exhibit 1 and the facts are incorporated herein. 25-mj-138-01/06-AJ, Complaint Package, attached as Exhibit 1. On

September 17, 2025, PIMENTAL was indicted for conspiracy to distribute and possess with intent to distribute. 25-cr-78-JL.

11.    As specified in Exhibit 1, on July 2, 2024, PIMENTEL sold fentanyl to an undercover officer ("UC-1") after UC-1 arranged the transaction with the DTO's phone number ending in 1489. *See* Exhibit 1, Complaint pg. 6, ¶ 15.

12.    In August 2024, investigators identified Thirty Pines Self Storage, 204 Fisherville, Road, Concord, New Hampshire, as a likely stash location that the Massachusetts-based DTO utilized due to the DTO's frequent visits to this location prior to meeting with identified drug customers/sub-distributors. Investigators obtained the rental agreement for the storage unit, which identified Rafael PIMENTEL as the renter for Unit 230, and listed his telephone number as the **Target Telephone**.

13.    On October 7, 2025, New England High Intensity Drug Trafficking Area Intelligence Analyst ("IA") Kevin Tivnan conducted a toll analysis for PIMENTEL'S phone. The analysis revealed that the **Target Phone** was activated on July 31, 2023 and has remained active. In 2024 during this investigation, the **Target Phone** had multiple communications with two numbers associated with charged co-conspirator Alexander AGUASVIVAS-PENA and a number associated with charged co-conspirator Michael TEJADA. On September 6, 2025, the toll analysis revealed a communication between the **Target Phone** and PIMENTEL'S suspected girlfriend and the **Target Phone's** subscriber, Grisselle Medrano Gonzalez.

14.    Based on this information, there is probable cause to believe that PIMENTEL has committed conspiracy to distribute and possess with intent to distribute controlled substances, that PIMENTEL utilizes the **Target Phone,** and that evidence of the **Target Phone's** location will likely lead to PIMENTEL'S arrest on his active arrest warrant. I know that cell phones are

typically carried on the user's person. Because there is an active arrest warrant for PIMENTEL, and investigators have not identified his specific location to execute that warrant, I believe that the requested information associated with the **Target Phone** will greatly assist the FBI in effecting his arrest. Prospective GPS "pings" will assist the FBI by providing real-time location updates for the **Target Phone**, which will assist in locating PIMENTEL. Additionally, historical location information for the past 30 days will assist investigators in identifying frequented locations and areas where PIMENTEL spends the overnight hours, which will assist in locating him. As soon as PIMENTEL has been located and arrested, the FBI will immediately discontinue the use of the requested information on the **Target Phone**.

15.     In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including GPS data or latitude-longitude data cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or GPS data.

16.     Based on my training and experience, I know that AT&T can collect E-911 Phase II data about the location of the **Target Phone**, including by initiating a signal to determine the location of the **Target Phone** on AT&T's network or with such other reference points as may be reasonably available.

17.     Based on my training and experience, I also know that AT&T can collect cellsite data about the **Target Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

18.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

19.     Based on my training and experience, I know that wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. This information could provide investigators with other areas to seek addresses associated with PIMENTEL and potentially identify his current residence.

20.     Based on the foregoing, there is probable cause to believe that obtaining the requested information related to the **Target Phone** described in Attachment B for thirty days historically and prospectively will lead to evidence that will assist in PIMENTEL'S arrest. There is probable cause to believe that PIMENTEL uses the **Target Phone** and obtaining information about the phone's location for the past 30 days, for 30 days from the issuance of this warrant, and any business records associated with this phone number will assist investigators in locating PIMENTEL and arresting him on his active warrant for conspiracy to distribute controlled substances.

21.     I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment

A for each communication to or from the **Target Phone**, without geographic limit, for a period of thirty (30) days.

22.    I further request that the Court direct AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T services, including by initiating a signal to determine the location of the **Target Phone** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

23.    I further request the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Phone** outside of daytime hours.

24.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the

extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A) and there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

Respectfully submitted,

/s/ Michael Belleau
Michael Belleau
Task Force Officer
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 41 and affirmed under oath the contents of this affidavit and application.

Date: **Oct 10, 2025**

Time: **3:59 PM**

**Talesha L. Saint-Marc**
United States Magistrate Judge

**ATTACHMENT A**

**Property to Be Searched**

1.        The cellular telephone assigned call number 401-391-3004 ("**Target Phone**"),

IMSI: 310280128704279, operated by AT&T ("the PROVIDER"), with subscriber listed as

Grisselle Medrano GONZALEZ, 673 East Ave., Warwick, Rhode Island, believed to be used by

Rafael PIMENTEL ("PIMENTEL"). The information sought is in the custody or control of the

PROVIDER, a wireless telephone service provider that accepts service of process at 1025 Lenox

Park Blvd., Atlanta, Georgia 30319.


2.        Records and information associated with the **Target Phone** that is within the

possession, custody, or control of the PROVIDER including information about the location of

the cellular telephone if it is subsequently assigned a different call number.

**ATTACHMENT B**

**Particular Things to be Seized**

All evidence related to the location and user of the **Target Phone** described in Attachment A that could assist in arresting PIMENTEL for violations of 21 U.S.C. § 841(a)(1) and § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses") to wit:

I.      **Information to be Disclosed by AT&T**

To the extent that the information described in Attachment A is within the possession, custody, or control of AT&T, including any information that has been deleted but is still available to AT&T or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), AT&T is required to disclose to the government the following information pertaining to the **Target Phone** listed in Attachment A:

a.  The following information about the customers or subscribers of the **Target Phone** from September 10, 2025 through the date of this Order:

   i.  Names (including subscriber names, usernames, and screen names);

   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI")

   iv.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Phone** from September 10, 2025 through the date of this Order, including:

> i.   The date and time of the communication, the method of the communication, and the source and destination of the communication;

> ii.  Call detail records to include numbers dialed, incoming numbers, call durations, signaling and communications processing information, geographic locations of towers and sectors activated, sent and received by the **Target Phone**, for any form of communication it is capable of including: voice, VoIP, VoLTE, text, SMS, MMS, internet, mobile-to-mobile, any push to talk feature, non-billed calls, uncharged call detail, airtime usage data, Automated Message Accounting records and data bases, calls-to-destination data and packet data, as available without communications content and excluding post-cut-through dialed digits);information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent; and

> iii. Cell site data, including any data reflecting: the cell towers and sectors thereof utilized in routing any phone, text, or data communication to or from the **Target Phone**; the approximate range of the **Target Phone** from the cell towers during the communication (including per-call measurement "PCM", round-trip time "RTT" data, Historical Mobile Locators "NELOS", Timing Advanced Information, and Timing Advance Report Date ("True Call").

c.  All information about the location of the **Target Phone** described in Attachment A prospectively for a period of thirty days, during all times of day and night, including:

> i.   E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all cell site data, including any data reflecting: the cell towers and sectors thereof utilized in routing any phone, text, or data communication to or from the **Target Phone**; the approximate range of the **Target Phone** from the cell towers during the communication (including per-call measurement "PCM", round-trip time "RTT" data, Historical Mobile Locators "NELOS", Timing Advanced Information, and Timing Advance Report Date

"True Call");

ii. Call Detail Records ("CDR'S") including: cellular sites and associated street address to include numbers dialed, incoming numbers and call durations, signaling and communications processing information, geographic locations of towers and sectors activated, sent, and received by the **Target Phone** for any form of communication it is capable of including voice, VoIP, VoLTE, text, SMS, MMS, internet, mobile-to-mobile, any push to talk feature, non-billed calls, uncharged call detail, airtime usage data, Automated Message Accounting records and data bases, calls-to-destination data and packet data, as available without communications content and excluding post-cut-through dialed digits;

iii. Radio Signal Strength Indicators ("RSSI"), timing advance, and other pertinent information delivered in real time with regard to neighboring towers as feasible;

iv. The MAC address of the **Target Phone** to include 1) Wi-Fi MAC address of the **Target Phone** and/or the access point(s) to which the **Target Phone** connects to the internet via wireless technology that allows computers and other devices to communicate over a wireless signal (commonly referred to as Wi-Fi) and packet data; and

v. All Internet Protocol ("IP") address, email address, email logs (without content such as the body of the email or subject lines), website address, servers, usernames, Wi-Fi hotspot locations, Wi-Fi ID history, and IP history location, including user identifying information and communications to and from the **Target Phone**.

To the extent that the information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the **Target Phone** on AT&T's network or with such other reference points as may be reasonably

available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

The service provider shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b). See 18 U.S.C. § 2705(b). The service provider may disclose this Order to an attorney for the service provider for the purpose of receiving legal advice.

**II.**    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of the **Target Phone's** location to locate and arrest PIMENTEL for violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute and possess with intent to distribute controlled substances) during the identified time periods.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

This warrant does not authorize the collection of any content of any communications.

EXHIBIT 1

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of New Hampshire

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| ALEXANDER AGUASVIVAS-PENA, FELINA | ) | |
| PIMENTAL, MICHAEL SUAZO TEJADA, JOSE | ) | 25-mj-138-01/06-AJ |
| DAVID ALVARADO, RAFAEL PIMENTAL, | ) | |
| AND MANUEL GUZMAN VITIELLO | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  Dec.1, 2023 through July 31, 2025  in the county of _____ in the

_____ District of  New Hampshire , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count 1: 21 U.S.C. 841(a)(1), (b)(1) (C) & 846 | Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine, Cocaine, and Fentanyl. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

/s/ Michael Belleau
*Complainant's signature*

Michael Belleau, FBI Task Force Officer
*Printed name and title*

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim P. 4.1 and affirmed under oath the content of this complaint and affidavit.

Date:  **Aug 12, 2025**

*Judge's signature*

City and state:  Concord, New Hampshire

Andrea K. Johnstone, US Magistrate Judge
*Printed name and title*

EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| ALEXANDER AGUASVIVAS-PENA, FELINA PIMENTAL, MICHAEL SUAZO TEJADA, JOSE DAVID ALVARADO, RAFAEL PIMENTAL, and MANUEL GUZMAN VITIELLO, | Case No. 1:25-mj-138-01/06-AJ |
| Defendants. | |

**AFFIDAVIT IN SUPPORT OF
CRIMINAL COMPLAINT**

I, Task Force Officer Michael Belleau, being duly sworn, state under oath as follows:

Introduction

1.      I submit this affidavit in support of a criminal complaint charging **Alexander Aguasvivas-Pena ("PENA"), Felina Pimental ("F. PIMENTAL"), Michael Suazo Tejada ("TEJADA"), Jose David Alvarado ("ALVARADO"), Rafael Pimental ("R. PIMENTAL"), and Manuel Guzman Vitiello ("VITIELLO")** with conspiracy to distribute methamphetamine, fentanyl, and cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846. Title 21 United States Code, Section 841(a)(1) makes it a crime for any person "knowingly or intentionally to … distribute . . . or possess with intent to [ ] distribute . . . a controlled substance."   Title 21, United States Code, Section 846 provides, "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

1

EXHIBIT 1

2.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  I also am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and authorized to apply for search warrants.

3.    I am employed as State Trooper with the New Hampshire State Police and have been so employed by the New Hampshire Department of Safety since December of 2012. Prior to my present employment, I was employed by the City of Somersworth, NH as a full-time Police Officer from September 2007 to December 2012. I received my Bachelor's degree in Criminal Justice Studies from St Anselm College in May of 2005. I have been certified as a full-time police officer after receiving my certification in January 2008, as a member of the 145th Police Academy class from the Police Standards and Training Council in Concord, NH. I have since attended the New Hampshire State Police Basic Drug Investigation Course, the United States Drug Enforcement Administration Basic Drug Identification Course, Traps and Hides School by the Drug Enforcement Administration, and the Federal Bureau of Investigation's Regional Undercover School among other drug related trainings. I was assigned to the New Hampshire State Police Narcotic Investigations Unit as a Detective from 2016 until February of 2022, before being assigned as a task force officer ("TFO") to the Federal Bureau of Investigation ("FBI") Major Offender Task Force ("MOTF"), where I am currently assigned.

4.    During my law enforcement career, I have investigated a number of cases involving the distribution of narcotic drugs by mid to high level drug trafficking organizations ("DTOs"). During those investigations, I have participated in surveillance, the execution of search warrants, controlled buys, wire taps, and the interviewing of witnesses, suspects, and informants.

EXHIBIT 1

5.      I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones. I have received extensive specialized training in the field of controlled substance identification, investigation and enforcement.

6.      The facts in this affidavit come from my personal observations, my personal training and experience, and the information that I have received from other law enforcement agents and witnesses involved in this and other investigations. This affidavit is intended to show merely that there is sufficient probable cause for the issuance of the requested criminal complaint and arrest warrant and does not set forth all my knowledge about this matter.

7.      Based on my training and experience and based on the facts set forth in this affidavit, I submit there is probable cause to believe that beginning on or about December 1, 2023 through July 31, 2025, in the Districts of New Hampshire and Massachusetts, **PENA, F. PIMENTAL, TEJADA, ALVARADO, R. PIMENTAL, AND VITIELLO** knowingly and willfully combined, conspired, confederated, and agreed together and with each other, and with other persons known and unknown, to distribute and possess with intent to distribute controlled

EXHIBIT 1

substances, specifically, methamphetamine, fentanyl, and cocaine, Schedule II controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846.

<u>Probable Cause</u>

8.     The FBI MOTF investigators began utilizing a FBI Cooperating Witness ("herein described as CW-1") to conduct controlled drug purchases from the Pena DTO ("DTO") since approximately December 2023. CW-1's prior criminal convictions include Driving While Intoxicated (Misd. B) in 2019 and Falsifying Physical Evidence (Felony B) in 2020. During an interview with investigators in July 2023 for an unrelated criminal investigation, CW-1 initially denied knowledge regarding an associate's possession of a firearm.    However, when reapproached by investigators with contradicting information, they admitted their knowledge of the associate's firearm possession. It should be noted, that at the time of the interview, CW-1 was not a Cooperating Witness. Since July 2023, CW-1 has been consistent and reliable in providing information that investigators have corroborated, and investigators believe CW-1 to be credible. CW-1 is cooperating with law enforcement for monetary compensation.

9.     In February 2024, law enforcement began working with a second FBI Cooperating Witness (hereinafter "CW-2"). CW-2's prior criminal convictions include False Report to Law Enforcement (Misd. A) in 2019, Controlled Drug: Acts Prohibited (Felony B) in 2019, Resist Arrest/Detention (Misd. A) in 2019, Controlled Drug: Sale (Felony B) in 2015, Willful Concealment (Misd. A) in 2018, and Theft by Unauthorized Taking (Misd. A) in 2019. CW-2 is cooperating with law enforcement for consideration on pending drug charges.

10. On March 11, 2024, at the FBI MOTF's direction, CW-1 arranged the purchase of one pound of methamphetamine from the DTO at a Manchester, New Hampshire restaurant to occur the following day. CW-1 arranged this transaction through a known phone number for the

EXHIBIT 1

DTO ending in 5577. FBI TFO Matthew Niciu drove CW-1 to the controlled purchase. Prior to the transaction, investigators searched CW-1 for weapons, contraband, and other U.S. currency and also searched TFO Matthew Niciu's vehicle for the same, both with negative results.[1] Investigators provided CW-1 with $3,000 in official advanced funds ("OAF") and audio monitoring equipment. TFO Niciu dropped CW-1 off in front of the restaurant, parked his car, and entered a nearby retail store, leaving the car vacant. CW-1 then entered the driver side of the car. Investigators observed **TEJADA** exit his car carrying a white plastic bag, enter the passenger side of TFO Niciu's vehicle, and exit shortly thereafter without the white plastic bag. **TEJADA** returned to his car and left the parking lot. The white plastic bag left by **TEJADA** in TFO Niciu's car contained what the Drug Enforcement Administration later confirmed to be 446.3 grams of methamphetamine, 96% purity.

11. Shortly after the controlled purchase from **TEJADA**, investigators observed a Jeep registered to **F. PIMENTAL**, enter the restaurant's parking lot. **F. PIMENTAL** entered the restaurant and sat with CW-1. During the meeting, as confirmed by the audio recording, **F. PIMENTAL** discussed discounted drug pricing or cash payments for CW-1's introduction of new customers. **F. PIMENTAL** stated that her husband would be more involved in the future.

12. When debriefed, CW-1 stated that CW-1 arranged the drug transaction with a female who said that their associate was already at the restaurant waiting. CW-1 stated that the male entered the car and left the bag of methamphetamine in exchange for the money. CW-1 stated that the female agreed to meet with CW-1 inside the restaurant about future drug transactions.

13. After the meeting, investigators followed **F. PIMENTAL** to Boston, Massachusetts

---

[1] FBI MOTF searched the confidential witnesses and undercover officer for weapons, contraband, or other currency prior to and after each transaction.

and observed her meet with **TEJADA**.

14. In early July 2024, the DTO provided CW-1 and CW-2 with a phone number ending in 1489 for use to arrange future drug transactions.

15. On July 2, 2024, the FBI MOTF utilized an undercover officer ("UC") to conduct a controlled purchase of heroin/fentanyl. The UC arranged the transaction through the phone number ending in 1489. Prior to the transaction, investigators conducting surveillance observed **PENA** leave his suspected residence at Pacella Park Drive in Randolph, Massachusetts ("Pacella Park Drive apartment complex") – the same area that **F. PIMENTAL** returned to after her March 12, 2024 controlled purchase. The 1489 phone number directed the UC by text message to an address in Methuen, Massachusetts. Investigators observed **PENA** and a male later identified as **R. PIMENTAL** exit **PENA'S** car and approach the UC's window, returning to their car minutes later. The UC left and met investigators at a predetermined location, where the UC relinquished what the DEA laboratory confirmed to be 201.8 grams of fentanyl. The UC told investigators that the UC gave **PENA** the money and **R. PIMENTAL** took the fentanyl from his pants and gave it to the UC.

16. On August 12, 2024, investigators conducting surveillance of **TEJADA** observed him leave the Pacella Park Drive apartment complex's parking and drive to another address in Hyde Park, Massachusetts. Investigators observed **TEJADA** walk down a driveway toward a white Honda Accord that had just arrived. Investigators reviewed the ownership history for this car's VIN number, which revealed that **F. PIMENTAL** previously owned it.

17. Investigators observed **TEJADA** walk down the driveway and then return seconds later, carrying a large white colored bag that appeared to contain a large box. **TEJADA** went to the trunk of his car, manipulated the bag, and then threw the bag and the box on the ground. He

then left the parking lot and began driving on Interstate 95 North, toward New Hampshire. Law enforcement stopped his vehicle in New Hampshire and obtained a search warrant for it. Investigators located 10 cellophane-wrapped packages, found beneath carpeting in the car's trunk, which the DEA laboratory confirmed to contain 4,464.5 grams of 97% pure methamphetamine.

18. Before sending the methamphetamine to the laboratory, at the FBI laboratory's direction, FBI MOTF removed the methamphetamine from the cellophane wrapping and sent the cellophane itself for fingerprint analysis. The FBI laboratory reported that a latent print found on a piece of cellophane was identified as coming from the same source as a fingerprint on the card for **MANUEL GUZMAN VITIELLO**, UCN X2HLM5CPN, as maintained in the Next Generation Identification system, the FBI's national friction ridge print database.

19. Investigators conducting surveillance have since observed the white Honda Accord parked at **VITIELLO'S** address in Massachusetts and have observed **VITIELLO** as a passenger in the vehicle.

20. On August 14, 2024, CW-2 met with investigators to arrange a controlled purchase of Methamphetamine. During a recorded phone call to the 1489 phone number, a male voice that investigators identified as consistent with **PENA'S**, said that he would be in Concord, New Hampshire around 6:00 p.m. Investigators provided CW-2 with $1,500 in OAF and audio and video monitoring equipment. CW-2 arrived at the agreed upon location on Monroe Street in Concord. Investigators identified **PENA** approach CW-2's passenger side window. CW-2 gave **PENA** the money. **PENA** gave CW-2 directions to where he hid the drugs under a tree. CW-2 drove to the location that **PENA** described and retrieve an item from under a bush. CW-2 then drove to the predetermined meeting location to reconvene with investigators. CW-2 relinquished

7

EXHIBIT 1

what the Drug Enforcement Administration ("DEA") later confirmed to be 224.5 grams of methamphetamine, 94% purity.

21.     In late September 2024, the DTO provided CW-1 and CW-2 with a phone number ending in 9740 to arrange future drug transactions.

22.     On December 16, 2024, at the direction of investigators, CW-2 arranged the purchase of two ounces of cocaine through text messages with the phone number ending in 9740. In advance of the transaction, investigators met with CW-2 and provided CW-2 with $1,900 OAF and a recording device. CW-2 spoke with the 9740 phone's user, whose voice investigators identified as being consistent with **PENA'S** voice, and CW-2 was directed to an address in Manchester, New Hampshire. When CW-2 arrived, a male later identified as **ALVARADO** entered the passenger side of CW-2's car. **ALVARADO** then left the area. CW-2 met with investigators at a predetermined location and relinquished what the DEA laboratory later confirmed to be 54.6 grams of cocaine. During a debrief, CW-2 stated that the male entered his car and gave him the two bags of cocaine in exchange for the money. The video corroborated CW-2's debrief.

<u>Conclusion</u>

Based on the foregoing, there is probable cause to believe that **PENA, F. PIMENTAL, TEJADA, ALVARADO, R. PIMENTAL, AND VITIELLO** committed the offense conspiracy to distribute and possess with intent to distribute controlled substances, specifically methamphetamine, fentanyl, and cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846.

/s/ Michael Belleau
Michael Belleau
Task Force Officer
Federal Bureau of Investigations

EXHIBIT 1

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and complaint.

Date: **Aug 12, 2025**
_____

Time: **2:39 PM, Aug 12, 2025**

**Andrea K. Johnstone** _____
UNITED STATES MAGISTRATE JUDGE

EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:25-mj-138-01/06-AJ |
| | ) | |
| ALEXANDER AGUASVIVAS-PENA, | ) | |
| FELINA PIMENTAL, | ) | |
| MICHAEL SUAZO TEJADA, | ) | |
| JOSE DAVID ALVARADO, | ) | |
| RAFAEL PIMENTAL, and | ) | |
| MANUEL GUZMAN VITIELLO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MOTION TO SEAL AT LEVEL II:
COMPLAINT, AFFIDAVIT, ARREST WARRANT,
THIS MOTION, & DOCKET TEXT ENTRIES

The United States of America respectfully moves to seal at Level II the complaint,

affidavit, and arrest warrant in this case, this motion, and the corresponding docket text entries

until the defendants are taken into custody.

Under Federal Rule of Criminal Procedure 49.1(d) and Local Rule 83.12(a)(1), the Court

has authority to grant this motion.

The Court should seal these documents because, based on investigative information, it is

unlikely that the defendants are aware that they are targets of a criminal investigation. The

premature release of these documents may cause the defendants to destroy evidence, flee to

avoid arrest, and make apprehending them more difficult and dangerous than it would be

otherwise.

EXHIBIT 1

*United States v. Pena, et al.*
Motion To Seal Complaint & Arrest Warrant
Page 2 of 2


      The United States expressly excludes from the scope of this motion the distribution of the

arrest warrant to and among law enforcement agencies, including the posting of the arrest

warrants to law enforcement databases and indices.

      Respectfully submitted,


                          JOHN J. MCCORMACK
                          Acting United States Attorney


Dated: August 12, 2025        By: /s/ Heather A. Cherniske
                          Heather A. Cherniske
                          Assistant United States Attorney


Motion:      ☑ Granted    ☐ Denied

United States Magistrate Judge
United States District Court
District of New Hampshire
**Aug 12, 2025**